1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,          CASE NO. 14-cr-2547-GPC

11                        Plaintiff,    **ORDER DENYING DEFENDANT'S
                                        MOTION TO SUPPRESS**
12      v.                              **STATEMENTS**

13                                      [ECF No. 49]
     DECKY SANCHEZ,
14
                         Defendant.
15

16

17                         **INTRODUCTION**

18        On August 11, 2014, Defendant Decky Sanchez ("Sanchez" or "Defendant") was

19   arrested following the seizure of methamphetamine from a Ford Focus in which he was

20   riding as a passenger.  Sanchez is charged in a one-count information with importation

21   of methamphetamine.  (ECF No. 1.)  On January 10, 2015, Defendant filed a motion

22   to suppress evidence challenging his post-arrest statement based on a violation of Rule

23   5(a) of the Federal Rules of Criminal Procedure.  (ECF No. 49.)  On March 19, 2015,

24   Defendant supplemented his motion and argued that the post-arrest statement was the

25   fruit of an arrest made without probable cause.  (ECF No. 65.)  An evidentiary hearing

26   on the motion was conducted on April 10, 2015.  (*See* ECF No. 68.)  Based on the

27   papers filed, the testimony of the witnesses called, and the exhibits admitted, the Court

28   **DENIES** the motion to suppress statements.

1

**FACTUAL BACKGROUND**

2 **A. Primary Inspection**

3        On August 11, 2014, at approximately 12:06 a.m., Erica Aguilar ("Aguilar") and

4 Sanchez (collectively "Defendants") applied for admission into the United States from

5 Mexico at the San Ysidro Port of Entry ("POE") in a 2000 Ford Focus bearing

6 California license plates. Aguilar was the driver and Sanchez was the front seat

7 passenger. (Decl. of Decky Sanchez ("Sanchez Decl."), ECF No. 65 ¶¶ 1-2.)  The

8 primary inspection officer referred the Ford Focus to a secondary inspection lot. (*Id.*

9 ¶ 4.)

10 **B. Secondary Inspection**

11        At approximately 12:35 a.m. the Ford Focus was driven through the Z-portal

12 X-ray machine ("Z-Portal") where anomalies were noted inside the rear quarter panels

13 of the vehicle. Thereafter, at 12:45 a.m., California Border Patrol ("CBP") Canine

14 Enforcement Officer Dominique Garcia and her Human/Narcotic Detection Dog

15 "Ghandi" screened the vehicle and the canine alerted to a trained narcotic odor

16 emanating from the quarter panels of the vehicle.

17        In his declaration, Sanchez states that after the car came out of Z-Portal, four

18 unknown officers surrounded the Focus, ordered Sanchez and Aguilar to get out of the

19 car, and placed Sanchez in handcuffs. (Sanchez Decl. ¶ 6.) He also claims that he was

20 told by an unknown officer that he was under arrest. (*Id.*)

21        CBP Officer Edwin Diaz testified that he was assigned to the secondary area at

22 the time that the Focus was referred to secondary.  Officer Diaz testified that at

23 approximately 12:30 a.m. he handcuffed Sanchez and escorted him to the Security

24 Office for a pat down search.  Officer Diaz did not recall saying anything to Sanchez

25 but did not tell Defendant he was under arrest.  After escorting Sanchez to the security

26 office and patting him down, Officer Diaz testified that he removed Sanchez's

27 handcuffs and instructed him to take a seat in the security office.

28        CBP Officer Steven Bui testified he was assigned to conduct the secondary

1  inspection of the vehicle. During his inspection, Officer Bui removed the interior

2  quarter panel and a piece of foam insulation from the passenger side of the vehicle.

3  Officer Bui saw a package and probed it. The substance inside the package field tested

4  positive for methamphetamine. Officer Bui testified that he then proceeded to the

5  Security office where he placed Sanchez under arrest at approximately 1:40 a.m.

6  **C. Processing**

7      Upon arrest, CBP officers began the Defendants' standard processing. Standard

8  CBP processing includes seizing the narcotics, vehicle, personal effects, and other

9  evidence, preparing incident reports, and fingerprinting. (*See* ECF No. 59 at 4.) In all,

10  eight packages—three from the passenger side quarter panel and five from the driver's

11  side quarter panel—were removed from the vehicle. The packages had a total weight

12  of 8.65 kilograms (21.60 pounds) of methamphetamine.

13      At 1:46 a.m., CBP Officer Bui notified Homeland Security Investigation ("HSI")

14  agents of the seizure in order for HSI agents to take custody of Defendants and conduct

15  the investigation. (Decl. of Special Agent Patrick MacKenzie ("Mackenzie Decl."),

16  ECF No. 59-1 ¶ 3). At the time, three (3) special agents were on duty—Special Agents

17  ("SA") Shawn Doyle, Diana Hakala, and Patrick MacKenzie. (*Id.*) At 3:00 a.m., SA

18  MacKenzie and SA Doyle proceeded to the San Ysidro POE from the Tecate POE

19  where they had been processing an earlier seizure. (Mackenzie Decl. ¶ 4.) The agents

20  arrived at the San Ysidro POE at approximately 3:45 a.m. (*Id.*)

21      Upon their arrival, CBP officers were still in the process of completing the

22  seizure. (*Id.*) SA MacKenzie reviewed the items recovered from the incident,

23  including cell phones and extensive pocket trash, and determined what items to seize

24  as evidence and what items would be seized as personal effects. (*Id.*)

25  **D. Defendants' Post-Arrest Statements**

26      **1. Erica Aguilar**

27      At 5:30 a.m., following completion of the initial processing, SA MacKenzie and

28  SA Hakala interviewed Aguilar, the driver. (Mackenzie Decl. ¶ 5.) Aguilar was

1    advised of her Miranda rights, waived her rights, and made statements without an

2    attorney being present.  (*See id.*, Ex. 1.)  Aguilar stated, among other things, that

3    Sanchez knew about the narcotics and was paid $1,300.  (*See* ECF No. 59 at 5.)  She

4    had introduced Sanchez to drug smuggling.  (*Id.*)  Sanchez told her to tell the CBP

5    officers that they had been to Mexico to party.  (*Id.*)  Her friend "Ulysses" provided her

6    the car.  (*Id.*)  Aguilar's interview lasted approximately 35 minutes.  (*Id.*)

7         **2.  Decky Sanchez**

8         At approximately 6:48 a.m., agents obtained biographical information from

9    Sanchez.  (Mackenzie Decl. ¶ 7.)  At 6:56 a.m., Sanchez was advised of his Miranda

10   rights in the English language by SA MacKenzie and SA Hakala.  (Mackenzie Decl.

11   ¶ 8 and Ex. 2.)  Sanchez stated that he understood his rights, he knowingly and

12   intelligently waived his rights, and then he agreed to make a statement without an

13   attorney being present.  (*Id.*, Ex. 2.)  Sanchez made a statement where he reportedly

14   admitted that he knew there were drugs in the vehicle and he was to be paid $500.

15   (ECF No. 59 at 6.)  Sanchez's interview lasted approximately 28 minutes.  (*Id.*)

16   **E.  Time Period Until Presentment**

17        Upon conclusion of the interviews, Defendants were transported to San Diego,

18   California, to be booked into the Metropolitan Correction Center ("MCC").

19   (MacKenzie Decl. ¶ 9.)  SA MacKenzie filed the Complaint charging the Defendants

20   with the unlawful importation of narcotics, (*Id.* ¶ 10), and Magistrate Judge David H.

21   Bartick found probable cause to hold the Defendants for violation of 21 U.S.C. §§ 952

22   and 960.  (*See* ECF No. 59 at 6.)

23        Consistent with a reported practice in the district—requiring defendants to be

24   booked into the MCC before initial appearance in court—Department of Homeland

25   Security agents received a "Reservation Number" from the MCC for August 11, 1014.

26   (MacKenzie Decl. ¶ 11.)  That reservation resulted in the first available booking time

27   of 12:30 p.m. on August 11, 2014, and the Defendants were taken into custody by the

28   Bureau of Prisons at that time.  (*See id.* ¶ 11 and Ex. 3.)

**F. Presentment**

On August 12, 2014, at approximately 9:30 a.m., Sanchez made his initial appearance before Magistrate Judge David H. Bartick. (ECF No. 4 (minute entry for hearing); ECF No. 49-1 (Def.'s Mem.) at 5; ECF No. 59 (Pl.'s Opp'n) at 7.)

## LEGAL STANDARD

Federal Rule of Criminal Procedure 5(a) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge...." The rule established in *McNabb v. United States*, 318 U.S. 332 (1943) and *Mallory v. United States*, 354 U.S. 449 (1957), provides that "an arrested person's confession is inadmissible if given after an unreasonable delay in bringing him before a judge." *Corley v. United States*, 556 U.S. 303 (2009). In response to the *McNabb-Mallory* rule, Congress enacted 18 U.S.C. § 3501(c), which provides a six-hour "safe harbor" period during which a confession will not be deemed inadmissible solely because of delay in presentment to a magistrate judge. *United States v. Liera*, 585 F.3d 1237, 1242 (9th Cir. 2009).

In *Corley*, The Supreme Court reaffirmed the validity of the *McNabb-Mallory* rule. *Corley*, 556 U.S. at 322. The Court concluded that § 3501(c) "modified *McNabb-Mallory* without supplanting it." *Id*. The Court described the procedure for applying *McNabb-Mallor*y in light of § 3501(c):

> [A] district court ... must find whether the defendant confessed within six hours of arrest (unless a longer delay was reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was made voluntarily and the weight to be given it is left to the jury. If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the confession is to be suppressed.

*Id*. (internal quotation marks and alterations omitted); *see also United States v. Garcia-Hernandez*, 569 F.3d 1100, 1105 (9th Cir. 2009) (describing *Corley*'s two-part test).

**DISCUSSION**

**A.  Sanchez's Statement Was Made Within Six Hours of His Arrest**

**1.  Sanchez Was Arrested No Earlier Than 1:27 a.m.**

The key issue in deciding the instant motion is determining the time of Sanchez's arrest, which commenced the six-hour period under § 3501(c).  Sanchez argues that he was arrested at 12:45 a.m. after the Z-Portal X-ray machine detected an anomaly in the rear quarter panel of the Focus and a drug detecting dog alerted to the quarter panels of the vehicle.  (*See* ECF No. 49-1 at 8.)   Sanchez states in his declaration that after the car came out of Z-Portal, four fully uniformed officers surrounded the Focus, told Sanchez to get out of the car, and handcuffed him.  (Sanchez Decl. ¶ 4.)  Sanchez further claims that one of the officers told him that he was "under arrest."  (*Id*.)

Meanwhile, the Government submits that Sanchez was not formally arrested until 1:41 a.m., after the rear quarter panels were accessed and the drug packages were removed and tested positive for methamphetamine.  (ECF No. 59 at 4 & 13).  CBP Officer Diaz was assigned to the secondary area at the time that the Focus was referred to secondary.  Officer Diaz testified that at approximately 12:30 a.m. Sanchez was handcuffed and escorted to the Security Office for a pat down search.  Officer Diaz testified that he did not tell Sanchez he was under arrest and that this was not his intention when he handcuffed him.  After escorting Sanchez to the security office and patting him down, Officer Diaz removed Sanchez's handcuffs and instructed him to take a seat in the security office.

CBP Officer Steven Bui testified at the hearing that he was assigned to conduct an intensive search of the Ford Focus at approximately 12:45 a.m.  He testified that he had not reviewed the Z-Portal X-ray images at that time, but knew roughly where the drug detecting canine had alerted.  At approximately 1:20 a.m., Officer Bui located drug packages which were secreted behind foam inside of the rear quarter panels.  At approximately 1:27 a.m., Officer Bui removed a package, made an incision in it, and tested the contents, which field tested positive for methamphetamine.  Officer Bui then

14-cr-2547-GPC

1  proceeded to the security office, formally arrested Sanchez, and placed him in a holding
2  cell.

3         At issue here is whether a "detention," which does not require probable cause,
4  evolved into an "arrest," which must be supported by probable cause.  The standard for
5  determining whether a person is under arrest is not simply whether a person believes
6  that he is free to leave, *see United States v. Mendenhall*, 446 U.S. 544 (1980), but
7  rather whether a reasonable person would believe that he is being subjected to more
8  than the "temporary detention occasioned by border crossing formalities." *United*
9  *States v. Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001).  Thus, whether an individual is
10 in custody depends upon the objective circumstances of the situation, or whether "'a
11 reasonable innocent person in such circumstances would conclude that after brief
12 questioning he or she would not be free to leave.'" *United States v. Montero-Camargo*,
13 177 F.3d 1113, 1121 (9th Cir. 1999) (*quoting United States v. Booth*, 669 F.2d 1231,
14 1235 (9th Cir. 1981)) (emphasis added), *aff'd*, 208 F.3d 1122 (9th Cir. 2000) (*en banc*)
15 (affirming panel's decision on narrower grounds, but not disturbing panel's standard
16 or decision on whether defendant was in custody).

17        The fact that these events occurred at the border influences the inquiry into
18 whether a reasonable innocent person would have believed that he was under arrest.
19 *United States v. Bravo*, 295 F.3d 1002, 1009 (9th Cir. 2009).  Because of the special
20 concerns surrounding border crossings, people expect greater intrusions into their
21 privacy. *See United States. v. Montoya de Hernandez*, 473 U.S. 531, 539–40 (1985)
22 ("[N]ot only is the expectation of privacy less at the border than in the interior, the
23 Fourth Amendment balance between the interests of the Government and the privacy
24 right of the individual is also struck much more favorably to the Government at the
25 border") (citations omitted).  Detention and questioning during routine searches at the
26 border are considered reasonable within the meaning of the Fourth Amendment.
27 *United States v. Espericueta–Reyes*, 631 F.2d 616, 622 (9th Cir. 1980) ("During such
28 a search, some period of detention for these persons is inevitable. Nevertheless, so long

1    as the searches are conducted with reasonable dispatch and the detention involved is

2    reasonably related in duration to the search, the detention is permissible under the

3    Fourth Amendment").  The facts in this case demonstrate that following a drug

4    detecting canine alert to the vehicle in which Sanchez was a passenger, Sanchez was

5    handcuffed, escorted to the security office, and patted down in the security office where

6    the handcuffs were removed following the pat down search.  The question is whether

7    these facts would have led one to believe that they were subjected to more than

8    temporary detention occasioned by border crossing formalities.

9         The Ninth Circuit in *Bravo* found that facts similar to the instant case gave rise

10   to a border detention and not an arrest. In *Bravo*, the defendant argued that the

11   combination of the handcuffing, frisk, pat-down, and shoe search transformed his

12   border detention into an arrest because a reasonable innocent person would not have

13   felt free to leave even after his vehicle was searched. *Bravo*, 295 F.3d at 1009-10.  The

14   *Bravo* court acknowledged that certainly handcuffing is a substantial factor in

15   determining whether an individual has been arrested, *see United States v. Juvenile

16   (RRA-A)*, 229 F.3d 737, 743 (9th Cir. 2000) ("Given the totality of the circumstances

17   ... we conclude that RRA-A's handcuffing was the clearest indication that she was no

18   longer free to leave and therefore find it to be the point of arrest"); however,

19   handcuffing alone is not determinative, *see Booth*, 669 F.2d at 1236 ("Handcuffing a

20   suspect does not necessarily dictate a finding of custody. Strong but reasonable

21   measures to insure the safety of the officers or the public can be taken without

22   necessarily compelling a finding that the suspect was in custody.") (citations omitted).

23        The *Bravo* court then considered whether a handcuffed, 30-40 yard walk to the

24   security office turns a detention into an arrest.  The court held that it did not.  *Id. at

25   1011; see also United States v. Yang*, 286 F.3d 940, 950 (7th Cir. 2002) (finding the

26   brief time the defendant endured in handcuffs negated conclusion that he was under

27   arrest).

28        In the instant case, like *Bravo*, Sanchez was handcuffed and escorted to the

1  security office for a pat down.  After the pat down, the handcuffs were removed.  Once

2  the methamphetamine was found in the vehicle,  Sanchez was moved to a detention cell

3  at which time no reasonable person would have believed that they were free to leave.

4       Sanchez argues that *Bravo* is distinguishable because Bravo was told that the

5  handcuffs were only temporary for officer safety and would be removed at the security

6  office; and was told he would be free to leave if nothing was found in the vehicle.

7  While there is no evidence that Sanchez was told that the handcuffs were temporary,

8  the fact is that Sanchez had little time to consider the effect of the handcuffs on his

9  freedom because they were removed shortly after they were applied. In addition,

10  Sanchez was not placed in a detention cell but was seated in a security office, which

11  was further evidence of a temporary detention occasioned by border crossing

12  formalities.

13       Also relevant in the Court's analysis is *United States v. Doe*, 219 F.3d 1009 (9th

14  Cir. 2000), where a defendant was taken to a security office, searched for weapons and

15  contraband, and seated on a bench to await a search of his vehicle.  The *Doe* court held

16  that the defendant was not in custody at the time he was escorted to the security office

17  to await the results of the examination of the load vehicle, but once drugs were found

18  and he was moved to a detention cell, "no reasonable person would have believed he

19  was free to leave."  *Id*. at 1014.  Thus, the detention rose to an arrest when the

20  defendant was moved to a locked detention cell. In this case, Sanchez was moved to

21  a detention cell at approximately 1:40 a.m., approximately 15 minutes after

22  methamphetamine was found. Applying the *Doe* analysis to the facts of this case,

23  Sanchez's detention rose to an arrest at approximately 1:40 a.m.

24       To support his motion, Sanchez relies on *United States v. Juvenile (RRA-A)*.  In

25  *RRA-A*, the defendant was a passenger in a vehicle that was referred to secondary

26  inspection for a more extensive search.  *Juvenile (RRA-A)*, 229 F.3d at 743.  During

27  the secondary inspection, the defendant was frisked and detained.  *Id*. at 741.

28  Afterwards, officers found 80 pounds of marijuana in the vehicle and subsequently

1    handcuffed the defendant to a bench in a locked security office for the next four hours

2    until an agent informed her that she was under arrest and advised her of her Miranda

3    rights.  *Id*.  The Ninth Circuit, analyzing the totality of the circumstances, found that

4    the arrest began when the defendant was handcuffed to the bench in the locked security

5    office, not when she was initially frisked and detained, as she contended, but also not

6    when she was actually told that she was under arrest, as the government argued.  *Id*. at

7    743.

8         In this case, unlike *RRA-A*, Sanchez was not handcuffed to a bench for four hours

9    after the officers found drugs in the vehicle in which he was a passenger.  In *RRA-A*,

10   the court observed that "[a] reasonable person handcuffed for four hours in a locked

11   security office after a narcotics search 'would have believed that [s]he was not free to

12   leave.'"  *Id*. (*quoting Mendenhall*, 446 U.S. at 554).  *RRA-A* expressly held that the

13   defendant was not under arrest when she was escorted to the security office, frisked,

14   and made to wait (without handcuffs) for the results of the vehicle search.  *RRA-A*

15   provides no support for Sanchez.

16        Taken together, the Court concludes that the circumstances of Sanchez's

17   detention would lead a reasonable innocent person to believe that he would be free to

18   go once the search of the Focus was over and he answered any questions.  Ultimately

19   the search revealed packages containing methamphetamine.  As such, the arrest of

20   Sanchez occurred no earlier than 1:27 a.m. when a field drug test revealed that

21   packages in the vehicle contained methamphetamine.  Sanchez was Mirandized and

22   waived his Miranda rights at approximately 6:56 a.m.  Thus, Sanchez's incriminating

23   statements were made within six hours of his arrest, the safe harbor under 18 U.S.C.

24   § 3501(c).

25        **2.  Sanchez Was Not Detained Within the Meaning of § 3501(c)**

26        Alternatively, Sanchez argues that even if he was not technically under arrest

27   when he was handcuffed and escorted to the security office, he was detained within the

28   meaning of 18 U.S.C. § 3501(c) at such time.  (ECF No. 49-1 at 9.)  Section 3501(c)

14-cr-2547-GPC

1  provides that the six-hour safe harbor is triggered by a person's "arrest or other

2  detention."

3          Sanchez acknowledges that there is no caselaw which supports his position, but

4  looks to *United States v. Gowadia*, 760 F.3d 989 (9th Cir. 2014), for recognition of his

5  argument.  However, in *Gowadia*, the defendant argued that the words "arrest or other

6  detention" in § 3501(c) expanded the right to prompt presentment beyond the contours

7  of Rule 5(a), meaning that the right to presentment may attach even absent formal

8  arrest.  *Gowadia*, 760 F.3d at 994.  The *Gowadia* court rejected this formulation.  *Id.*

9  The *Gowadia* court began its analysis by observing:

10          As the Court explained in *Corley*, the starting point for claims under
          § 3501 is "whether the defendant confessed within six hours of *arrest*."
11          *Id.* (emphasis added).  In other words, "[section] 3501 modified
          *McNabb-Mallory* without supplanting it." *Id.* The language and analysis
12          of the section focus on the time of *arrest*, a point that makes sense
          because Rule 5(a) applies only in situations involving formal *arrest* on
13          specific charges. Fed.R.Crim.P. 5(a)(1) ("Appearance Upon an *Arrest*").
          By its own terms, the Rule governs the conduct of "person[s] making an
14          *arrest*," and dictates that those persons bring "the defendant" before a
          magistrate judge. Fed.R.Crim.P. 5(a)(1)(A). Rule 5(a) interacts with
15          subsections 5(d) and 5(e), which specify that the magistrate judge must
          convey certain information to the "defendant": the "complaint against
16          [him]," for instance, and the right to counsel. Fed.R.Crim.P. 5(d); 5(e)
          (citing Rule 58(b)(2)). Without specific pending criminal charges, the
17          directives of Rules 5(d) and 5(e) would make no sense; the magistrate
          would have nothing to tell a person not yet accused or arrested.
18          Fed.R.Crim.P. 5(d); 5(e); see also Black's Law Dictionary 482 (9th
          ed.2009) (defining a "defendant" as the "accused in a criminal
19          proceeding"). (Emphasis added.)

20  *Id*. at 993-94.

21          Sanchez argues that there are three reasons why the Court should find that

22  Sanchez was in "other detention" as used in § 3501(c): (1) the facts of *Gowadia* are

23  distinguishable; (2) interpreting the term this way is consistent with the principle of

24  statutory construction that courts should give effect, if possible, to every clause or word

25  in a statute; and (3) a failure to apply this term to the instant case would eviscerate the

26  *McNabb-Mallory* rule.  (ECF No. 49-1 at 9-10.)

27          A failure to apply "other detention" to the instant case will not eviscerate the

28  *McNabb-Mallory* rule given that there are no facts showing that there was any period

- 11 -                                                      14-cr-2547-GPC

1    of delay that was for the purpose of interrogation. Sanchez was arrested within 65

2    minutes of applying for admission into the United States. During this time, law

3    enforcement officers performed primary inspection of the subject vehicle, a Z-Portal

4    x-ray, a drug detecting canine sniff, and an intrusive search of the interior of the

5    vehicle, which led to the discovery of methamphetamine and arrest of Sanchez.

6         In *Gowadia*, the Ninth Circuit reserved judgment on whether the term "other

7    detention" might have independent meaning from "arrest" upon formal charges in an

8    extraordinary situation.  The court assumed without deciding that the two terms have

9    different meanings, but found it unnecessary to resolve the potentially far-reaching

10   question under the facts before the court.  The Court finds that the instant case does not

11   present an extraordinary situation; it involves a routine border detention which quickly

12   led to a seizure of drugs and the arrest of Sanchez for the importation of

13   methamphetamine.  Sanchez was not the subject of "other detention" at the time that

14   he was handcuffed and escorted to the security room.

15        The Court finds that the statement of Sanchez was given within the six-hour safe

16   harbor and is admissible, subject to the other Rules of Evidence, and other limitations,

17   and the weight to be given it will be left to the jury.

18   **B. The Arrest of Sanchez Was Supported by Probable Cause**

19        In addition, Sanchez argues that as of 1:42 a.m., probable cause to arrest did not

20   exist and his post-arrest statement should be suppressed as the fruit of an illegal arrest.

21   (ECF No. 67 at 4.)  Sanchez asserts that the officers lacked probable cause to arrest

22   where he was arrested based on his mere presence in a car with a commercial quantity

23   of drugs concealed within it.  (*Id*.)

24        In *United States v. Heiden*, 508 F.2d 898 (9th Cir. 1974), the Ninth Circuit held

25   that officers had probable cause to arrest a passenger of a load vehicle because they

26   reasonably believed that he was involved in the transporting of 110 pounds of

27   marijuana.  The court observed that the officers were not required to believe Heiden's

28   explanation that he did not know about the marijuana and whether Heiden could later

1    establish that he was only a passenger who did not know about the marijuana was no

2    reason for the officers to let him go free.  *Heiden*, 508 F.2d at 901.

3         Sanchez argues that the holding in *Heiden* was essentially overruled by *Ybarra*

4    *v. Illinois*, 444 U.S. 85 (1979) and *United States v. Hernandez*, 322 F.3d 592 (9th Cir.

5    2003).  In *Ybarra*, the Supreme Court ruled there was no probable cause to arrest a

6    defendant whose only connection to criminal activity was that he was a patron of a

7    public tavern where the police had probable cause to believe that a bartender possessed

8    heroin for sale.  *Ybarra*, 444 U.S. at 91.  Meanwhile, in *Hernandez*, the Ninth Circuit,

9    relying on the reasoning of *Heiden*, found that the defendant's "non-fortuitous presence

10   in the rear seat of a minivan laden with a commercial quantity of illegal drugs, in

11   conjunction with his suspicious behavior and his proximity to the illegal drugs, gave

12   the border agents probable cause to arrest [him]." *Hernandez*, 322 F.3d at 599.  The

13   defendant argued that *Heiden* was no longer good law following *Ybarra*.  *Id.* at 598.

14   The *Hernandez* court found that *Ybarra* did not apply to a passenger in a vehicle that

15   contains a large quantity of illegal drugs.  *Id.*  The court recognized that the mere

16   presence of a patron in a public tavern is far different from a passenger's presence in

17   a car containing a large quantity of illegal drugs.  *Id.*  "A car, unlike a tavern, is not

18   open to the public." *Id.*; s*ee also Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999)

19   ("A car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be

20   engaged in a common enterprise with the driver, and have the same interest in

21   concealing the fruits or the evidence of their wrongdoing").

22        Sanchez suggests that *Hernandez* modified *Heiden* so as to require more than

23   just a passenger's presence in a load vehicle carrying a commercial quantity of drugs

24   in order to support an arrest. (ECF No. 67 at 4).  However, *Hernandez* confirms that

25   *Heiden* is still controlling law in the Ninth Circuit following *Ybarra*. It does not

26   increase the quantum of evidence required to support the arrest of a passenger in a load

27   vehicle. As such, the Court finds that Sanchez's non-fortuitous presence in the

28   passenger seat of a vehicle transporting commercial quantities of methamphetamine

1  gave officers probable cause to arrest Sanchez at 1:42 a.m.  In addition, the Court finds

2  that by the time that Sanchez was interviewed, officers had developed further

3  information from the load driver implicating Sanchez in the intentional importation of

4  drugs into the United States.

5  **C.  Sanchez Received Miranda Warnings and Provided Voluntary Statements**

6  　　　Lastly, Sanchez moves to suppress his statements based upon the government's

7  failure to show compliance with *Miranda v. Arizona*, 384 U.S. 436 (1966), and failure

8  to demonstrate that the post-arrest statements were voluntary as required by 18 U.S.C.

9  § 3501.

10  　　　At the suppression hearing, SA McKenzie testified that he interviewed Sanchez

11  following Miranda advisement.  In addition, a video recording of the interview was

12  provided to the Court and reviewed.  The video shows Sanchez being advised of his

13  Miranda rights and voluntarily waiving them.  The Court finds that SA McKenzie

14  reviewed Sanchez's Miranda rights with him, that Sanchez understood his rights, and

15  that Sanchez waived his Miranda rights and made a statement that was voluntary.

16  　　　　　　　　　　　　　　　**CONCLUSION**

17  　　　For the foregoing reasons, the Court **DENIES** Defendant Sanchez's Motion to

18  Suppress Statements.

19

20  DATED:  April 23, 2015

21  　　　　　　　　　　　　　　　　HON. GONZALO P. CURIEL

22  　　　　　　　　　　　　　　　　United States District Judge

23

24

25

26

27

28